JUDGE CHIN

# 05 CV 9319

Philip R. Hoffman (PRH-1607)
Lisa M. Buckley (LB-5541)
PRYOR CASHMAN SHERMAN & FLYNN LLP
Attorneys for Plaintiff
410 Park Avenue
New York, New York 10022
(212) 421-4100

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

BRITE MEDIA GROUP LLC,                :        05 Civ.

                   Plaintiff,       :        **COMPLAINT**

     - against -                       :

BVM ENTERPRISES, LLC, BRIAN          :
MORRISON, STUART HUME, DONALD
DORE, RICHARD MILLS, BLM             :
INVESTMENTS, BRETT MORRISON and
WILLIAM McKEE,                       :

             Defendants.       :

-------------------------------------------------------------x

     Plaintiff Brite Media Group LLC ("BMG"), by its attorneys, Pryor Cashman Sherman &

Flynn LLP, as and for its complaint against defendants BVM Enterprises, LLC, Brian Morrison,

Stuart Hume, Donald Dore, Richard Mills, BLM Investments, Brett Morrison and William

McKee, alleges as follows:

## NATURE OF THE ACTION

     1.     In this action, plaintiff BMG seeks compensatory and punitive damages in excess

of $50 million and equitable relief for defendants' acts of federal securities and common law

fraud and breaches of contract in connection with the Membership Interest Transfer Agreement

entered into by the parties on January 21, 2005 (the "Agreement") pursuant to which BMG ac-

quired BriteVision Media, LLC ("BriteVision"), a company engaged in the business of selling

Philip R. Hoffman (PRH-1607)
Lisa M. Buckley (LB-5541)
PRYOR CASHMAN SHERMAN & FLYNN LLP
Attorneys for Plaintiff
410 Park Avenue
New York, New York 10022
(212) 421-4100

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

BRITE MEDIA GROUP LLC,                  :          05 Civ.

                        Plaintiff,      :          **COMPLAINT**

        - against -                     :

BVM ENTERPRISES, LLC, BRIAN             :
MORRISON, STUART HUME, DONALD
DORE, RICHARD MILLS, BLM                :
INVESTMENTS, BRETT MORRISON and
WILLIAM McKEE,                          :

                        Defendants.     :

------------------------------------------------------------x

        Plaintiff Brite Media Group LLC ("BMG"), by its attorneys, Pryor Cashman Sherman &

Flynn LLP, as and for its complaint against defendants BVM Enterprises, LLC, Brian Morrison,

Stuart Hume, Donald Dore, Richard Mills, BLM Investments, Brett Morrison and William

McKee, alleges as follows:

## NATURE OF THE ACTION

        1.      In this action, plaintiff BMG seeks compensatory and punitive damages in excess

of $50 million and equitable relief for defendants' acts of federal securities and common law

fraud and breaches of contract in connection with the Membership Interest Transfer Agreement

entered into by the parties on January 21, 2005 (the "Agreement") pursuant to which BMG ac-

quired BriteVision Media, LLC ("BriteVision"), a company engaged in the business of selling

advertising on coffee sleeves to various advertisers and then distributing those coffee sleeves containing the advertisers' messages to its network of independent cafés and coffeehouses (the "Café Network"). A copy of the Agreement is annexed hereto as Exhibit A.

2.     Defendants fraudulently induced BMG to enter into the Agreement and to transfer to defendants over $25 million in cash and securities by materially misrepresenting and concealing material facts relating to BriteVision's business operations and financial condition, including, but not limited to, the size and strength of the Café Network and its inability to deliver what it had sold to advertisers.

3.     The acts of fraud committed by defendants and only recently uncovered by BMG include, inter alia:

a.     Misrepresenting that the Café Network consisted of over 4,000 locations which had long-term executed contracts with BriteVision, when in fact only 1,900 locations had actually signed contracts of varying length with BriteVision;

b.     Failing to disclose that BriteVision, in order to falsely inflate the number of alleged contracts in its Café Network, had devised two schemes ("Terms In The Box" and "Check Cashed") pursuant to which it sought to contractually bind unsuspecting locations to ten-year exclusive contracts by: (1) inserting contracts in the boxes of sleeves and claiming that acceptance of the sleeves by the location (by any employee of the location signing a UPS log) constituted a contract; and (b) sending $15 or $20 checks to the locations and deeming the cashing of such checks to constitute a contract. The "contracts" derived from these two fraudulent schemes comprised over 50% of the locations allegedly in the Café Network;

c.     Concealing the fact that BriteVision was not living up to its obligations to its advertisers because it was unable to ship into the Café Network the amounts of sleeves it had promised to deliver (and in some instances did not even produce the amount of sleeves the

2

advertiser had ordered) and then, in order to further deceive BMG, reporting on its financial statements (as well as to its customers) that such sleeves had actually been shipped and delivered as contractually agreed;

        d.    Manipulating and falsifying BriteVision's financial statements by misrepresenting, <u>inter alia</u>, revenues, net income and cost of goods sold ("COGS");

        e.    Concealing the true state of the internal affairs of the company and failing to disclose that BriteVision had severe operational difficulties; and

        f.    Misrepresenting and concealing numerous other material items.

4.    Defendants' internal e-mails both prior to and after the January 21, 2005 closing of the transaction conclusively establish that: (a) defendants set out to and did fraudulently induce BMG to enter into the Agreement; and (b) defendants Brian Morrison, Brett Morrison and Bill McKee, three BriteVision Senior Executive Officers who remained with the company post-closing, continued to misrepresent and conceal material information from BMG post-closing in an attempt to cover-up their fraudulent activities.

5.    In addition to their fraudulent acts, defendants breached critical representations and warranties contained in the Agreement relating to, <u>inter alia</u>:  (a) "Contracts;" (b) "Financial Statements;" (c) "Books and Records;" (d) "Employees;" and (e) "Interim Change."

6.    Defendants also breached §3.32 of the Agreement ("Full Disclosure") pursuant to which the contracting parties further warranted and represented that "<u>[n]o representation or warranty made by [defendants] ... contains or will contain any material untrue statement of any fact or omit or will omit any material fact necessary in order to make any statement herein or therein, in light of the circumstances in which it was made, not misleading</u>."  (emphasis supplied).

## JURISDICTION AND VENUE

7.      This action arises under the Securities and Exchange Act of 1934, 15 U.S.C.

§78aa et seq. (the "Securities Exchange Act"), the Securities Act of 1933, 15 U.S.C. §77a, et seq.

(the "Securities Act") and the common law of the State of New York.  Jurisdiction is conferred

upon this Court pursuant to 28 U.S.C. §1331.

8.      The venue of this action is properly laid in this District pursuant to §12.9 of the

Agreement, which provides that New York law governs and that "[t]he parties hereby irrevo-

cably and unconditionally submit to the exclusive jurisdiction of any New York State or Federal

court sitting in New York County in any action or proceeding commenced by the other party …

arising out of or relating to this Agreement."

## PARTIES

9.      Plaintiff Brite Media Group LLC ("BMG") is a Delaware limited liability com-

pany which maintains its principal office in California and was formed for the purpose of acquir-

ing all of the stock of BriteVision Media, LLC ("BriteVision"), a California limited liability

company, pursuant to the Membership Interest Transfer Agreement dated January 21, 2005 (the

"Agreement").

10.     Defendant BVM Enterprises, LLC ("BVM") is a Delaware limited liability com-

pany which maintains its principal office in Florida and was formed by the former owners of

BriteVision (referred to in the Agreement as the "Members") for the purpose of transferring their

membership interests (referred to in the Agreement as "Securities") in BriteVision to BMG.

11.     Defendant Brian Morrison ("Morrison") is a resident of California and owns 75

Class A units in BVM, representing his former 86% membership interest in BriteVision, and is

BVM's sole manager with control over its decision-making powers.  At all times relevant herein,

Morrison was the President and Chief Executive Officer of BriteVision.  In August 2005, BMG

terminated Morrison's employment with BriteVision for cause because of his commission of:
(a) breaches of fiduciary duty to BriteVision; (b) acts of dishonesty and fraud involving Brite-
Vision; and (c) other acts which were materially injurious to BriteVision.

  12. Defendant Stuart Hume ("Hume") is a resident of New Hampshire and owns one
Class B unit in BVM, representing his former 1.15% membership interest in BriteVision.

  13. Defendant Donald Dore ("Dore") is a resident of California and owns ½ Class B
unit in BVM, representing his former 0.675% membership interest in BriteVision.

  14. Defendant Richard Mills ("Mills") is a resident of California and owns ½ Class B
unit in BVM, representing his former 0.675% membership interest in BriteVision.

  15. Defendant BLM Investments is a California general partnership which maintains
its principal office in California and owns 10 Class A units in BVM, representing its former
11.5% membership interest in BriteVision.

  16. Defendant Brett Morrison ("Brett") is a resident of California, a general partner
and owner of a substantial interest in BLM, and Brian Morrison's brother.  At all times relevant
herein, Brett was the Executive Vice President of Sales for BriteVision.  In September 2005,
BMG terminated Brett's employment with BriteVision for cause because of his commission of:
(a) breaches of fiduciary duty to BriteVision; (b) acts of dishonesty and fraud involving Brite-
Vision; and (c) other acts which were materially injurious to BriteVision.

  17. Defendant William McKee ("McKee") is a resident of California and, at all times
relevant herein, was the Chief Financial Officer of BriteVision.  Along with Morrison and Brett,
McKee was one of three Senior Executive Officers at BriteVision.  McKee resigned from Brite-
Vision in August 2005 before BriteVision could terminate him for cause.

## FACTS COMMON TO ALL COUNTS

18.     BriteVision, which was founded by Morrison in 1999, is in the coffee sleeve business. BriteVision's sleeves are cardboard insulators designed to be placed around cups to make them comfortable to handle when filled with hot or cold liquids. Printed on each sleeve is a visually appealing, full color, advertising message that wraps around the entire surface of the sleeve. The sleeves as an advertising medium are quite unique and powerful in that the advertising message "travels" with the consumer and is seen by other consumers along the way, leading to prolonged and multiple exposures.

### Morrison's Decision To Sell BriteVision And The Creation Of The BV Memorandum

19.     In or about July 2004, Morrison, who owned 86% of BriteVision and was also its President and CEO, began considering the possibility of selling all or a portion of BriteVision and engaged the firm of Johnsen, Fretty & Company ("JFC") to act as BriteVision's financial advisor in exploring the potential sale of the company.

20.     In order to solicit interest in BriteVision, JFC, based upon information and data provided to it by Morrison and others at BriteVision, prepared a comprehensive document for distribution to potential acquisition partners entitled "Descriptive Memorandum: BriteVision Media" and dated July 2004 (the "BV Descriptive Memorandum"). The BV Descriptive Memorandum purported to describe BriteVision's business and operations, set forth various financial information and discuss, in glowing terms, the company's future prospects.

21.     The BV Descriptive Memorandum made numerous material representations about BriteVision and its Café Network, including, but not limited to:

> [BriteVision], a rapidly growing, nationally scaled out-of-home ("OOH") media company, is the premier provider of coffee sleeve advertising. The Company has developed a compelling advertising platform consisting of an expanding network of approximately 5,700 upscale coffeehouses and cafés (the café network) spanning nearly 200 markets, including the top 25 DMAs. The Company's presence in the nation's top advertising markets as well as its unique ability to communi-

6

cate one on one with an attractive demographic base of affluent, on-the-go con-
sumers, has proven very appealing to a diverse base of premier national advertis-
ers such as Microsoft, Visa, AT&T, Jaguar, Schering Plough, JP Morgan Chase,
CBS, jetBlue, Hotels.com, MGM Pictures, Sony, Procter & Gamble, and the Dis-
covery Channel.  For the year ending December 31, 2004, (includes actual operat-
ing results through June 2004) the Company is estimating net revenue of $10.3
million and EBITDA of $4.6 million on a proforma basis.  (emphasis supplied).

* * * * *

The Company has successfully built a solid and diversified portfolio of upscale
cafés and coffeehouses on very attractive terms.  BriteVision typically signs a 10-
year agreement with a café or coffeehouse for the exclusive right to supply adver-
tising sleeves.  The Company's café network currently includes a total of nearly
5,700 cafés and coffeehouses, which Management anticipates growing to roughly
6,500 cafés and coffeehouses by the end of 2004, of which it is estimated that
approximately 90% will be under an exclusive agreement.  (emphasis supplied).

* * * * *

BriteVision is the only established, nationally scaled sleeve advertising company
in the country.  The Company has, and continues to, successfully secure long-
term agreements for the exclusive right to supply advertising sleeves within up-
scale cafés and coffeehouses.  BriteVision's café network currently spans nearly
200 markets, including the top 25 DMAs.  (emphasis supplied).

* * * * *

Through retaining outstanding relationships with its café network of 5,700 cafés
and coffeehouses and delivering sleeves consistently each and every month,
BriteVision has become the sleeve supplier of choice to the vast majority of
specialty cafés and coffeehouses across the country.  (emphasis supplied).

* * * * *

The Company continues to grow its café network through targeting both chains
and independents in existing and new markets.  Management anticipates adding
roughly 750 new cafés and coffeehouses to its current base of approximately
5,700 cafés and coffeehouses by the end of 2004, of which it estimates that about
90% will be under an exclusive agreement.  (emphasis supplied).

* * * * *

The Company typically enters into 10-year agreements with upscale cafés and
coffeehouses for the exclusive right to supply advertising sleeves, in addition to
lids and cups.  (emphasis supplied).

* * * * *

BriteVision's café network spans over 200 markets with a circulation of over 15 million sleeves per month, offering advertisers the ability to effectively target highly sought after audiences that have high levels of income, are well educated, and are professionals or hold management positions. (emphasis supplied).

* * * * *

Over the last five years, BriteVision has developed a solid portfolio of cafés and coffeehouses under attractive terms. The Company currently enters into 10-year agreements, (initial 5-year term, with BriteVision having the sole option to extend for an additional 5-year term under the same conditions), with cafés and coffee-houses to be the exclusive supplier of sleeves, on which the Company can place advertising. (emphasis supplied).

* * * * *

On average, Management estimates that each café or coffeehouse has an esti-mated monthly sleeve supply requirement of 2.5 cases, or 3,000 sleeves (1,200 sleeves per case). Once the sleeves are delivered, the only requirement of the café or coffeehouse is to place a sleeve on each hot beverage served. The Company's café network includes a total of 5,665 cafés and coffeehouses. The following is a breakout of the Company's café network as of August 2004.

| Café Network Summary | Cafés | % of Total # of Cafés |
|---|---|---|
| Independent Cafés | 4,204 | 74% |
| Café Chains | 1,461 | 26% |
| Total # of Cafés | 5,665 | 100% |
| | | |
| Under Agreement for ad sleeves | 4,061 | 72% |
| Under Agreement for custom sleeves only | 205 | 4% |
| Under Pending Agreements | 744 | 13% |
| Under No Agreement | 655 | 12% |
| Total # of Cafés | 5,665 | 100% |

Of the café network, 4,061 cafés and coffeehouses are under an exclusive agree-ment for advertising sleeves, 744 cafés and coffeehouses are under pending agree-ments, and the remaining 860 cafés and coffeehouses are either under an agree-ment for custom sleeves only (205 cafés and coffeehouses), or have accepted ad-vertising sleeves in the past, but are not currently under a formal agreement (655 cafés and coffeehouses). Underway is an aggressive initiative to convert the ma-jority of these 655 cafés and coffeehouses to an exclusive agreement by the end of 2004. To date, the Company has been virtually 100% successful in converting cafés and coffeehouses to exclusive agreements. ...

The average remaining agreement life per independent café and coffeehouse as of August 2004 is approximately 7.2 years. Management anticipates the average re-

maining agreement life increasing as the Company i) <u>signs new cafés and coffee-houses under 10 year agreements;</u> ii) converts those cafés and coffeehouses not currently under an agreement to a 10 year one; and iii) enters into new 10 year agreements with those cafés and coffeehouses under old 3 to 5 year agreements. <u>To date, the Company has been virtually 100% successful in converting those cafés and coffeehouses not under an agreement, or under an old 3 to 5 year agreement, to a 10 year exclusive agreement.</u>  (emphasis supplied).

* * * * *

<u>Cafés execute long-term exclusive and binding contracts with [BriteVision],</u> revealing volume and demographic information and agreeing to utilize only BriteVision coffee sleeves each month.  (emphasis supplied).

22.     As can be seen from the above, BriteVision in the BV Descriptive Memorandum represented to potential acquisition partners that BriteVision's major selling point was its alleged Café Network of 5,665 upscale cafés and coffeehouses (which was expected to grow to 6,500 by the end of 2004), 90% of which were bound to BriteVision by exclusive 10-year written agreements executed by the cafés or coffeehouses.  This representation, as well as other material representations contained in the BV Descriptive Memorandum, were knowingly false.

**BriteVision's Representations Relating To The Number Of Cafés And Coffeehouses In The Café Network And The Existence Of Signed Contracts With Them Were Knowingly False**

23.     In the summer of 2004, Bruce A. Friedman ("Friedman"), part of an investment group which would eventually become the owners of BMG, received the BV Descriptive Memorandum and, based upon the description of BriteVision and the material information relating to the company set forth therein, met with Morrison to discuss his investment group's possible interest in acquiring BriteVision.  Thereafter, in August 2004, the parties continued to engage in discussions by telephone, e-mail and in person.

24.     At the same time as Morrison was engaging in discussions with Friedman, he was also meeting with other potential suitors who had received the BV Descriptive Memorandum and had expressed interested in the possibility of acquiring BriteVision.

25.     Morrison, McKee and others at BriteVision were aware that the major selling point for BriteVision contained in the BV Descriptive Memo, i.e., its representation that its Café Network of 5,665 upscale cafés and coffeehouses, 90% of which were bound to BriteVision by exclusive 10-year written contracts executed by the cafés or coffeehouses, was a blatant lie.

26.     Internal BriteVision emails between Morrison, McKee and others at BriteVision show that they were well aware that BriteVision did not have 5,665 cafés and coffeehouses in the Café Network.  For example, when McKee informed Morrison that there were only 3,300 inde-pendent cafés and coffeehouses in the Café Network at the beginning of 2004 (as opposed to the 4,204 listed in the BV Descriptive Memorandum), Morrison responded to McKee on August 3, 2004: "Why don't we just go with 4k (est) then and get our #s together so we can tell a clean story in due dilligence."

27.     On that same day, August 3, 2004, Morrison and McKee exchanged numerous e-mails acknowledging the falsity of the number in the BV Descriptive Memorandum. Moreover, as Morrison acknowledged to McKee:  "I can tell this is a main question people are asking," i.e., how many cafés and coffeehouses were in the Café Network.  As evidenced by Morrison's telling McKee that they needed "to spin the story," the last thing that Morrison wanted to do was to provide a truthful answer to that question because he knew that it would cause potential acquisition partners to either lose interest in possibly acquiring BriteVision or would decrease the amount of any offer they might make to acquire BriteVision.

28.     On August 8, 2004, Morrison sent an e-mail to McKee entitled "due diligence list" in which he again acknowledged the severe problems regarding the false representation of the number of contracts contained in the BV Descriptive Memorandum: "café contracts in binder – synchs with what we're telling the market we have.  80% of what we are saying we have

must be written version." Morrison was well aware that BriteVision did not have binding written and/or fully-executed contracts for anywhere near 80% of its locations.

**Morrison's Fraudulent Schemes To Inflate The Number of Café Network Contracts**

29.     Morrison, aware that the representation in the BV Descriptive Memorandum that there were 5,665 upscale coffeehouses and cafés in its Café Network, 90% of which were bound to BriteVision by exclusive 10-year written contracts executed by the locations, was a blatant lie and that the truth would negatively impact defendants' efforts to sell the company, devised two fraudulent schemes, the purpose of which was to allow them to "tell a clean story in due dilligence" based on the claim that thousands of cafés and coffeehouses were under "written" contracts, even though such cafés and coffeehouses had neither signed a contract nor even knew that Brite-Vision was claiming that such cafés and coffeehouses were contractually bound to a contract of any length, let alone an exclusive one having a ten-year term.

**The "Terms In The Box" Scheme**

30.     One fraudulent scheme devised by Morrison in his attempt to falsely inflate the number of signed contracts in the Café Network was the "Terms In The Box" scheme, pursuant to which BriteVision began placing a location "contract" in each box of sleeves shipped to a café or coffeehouse. The "contract," signed only by Morrison, indicated in a legend that by accepting the sleeves, the café or coffeehouse was bound by a 10-year contract.

31.     When the sleeves were delivered by UPS, someone in the café or coffeehouse would sign for the delivery. BriteVision, upon receipt of the UPS confirmation containing that signature, would then put a printout from the UPS website in a binder so that it could, if necessary, argue that the café or coffeehouse was contractually bound for ten years, even though the reality was that the cafés or coffeehouses were unaware that there was a "contract" in the box or case to begin with.

11

32.     In its internal records, BriteVision referred to those locations which had been sent sleeves containing "Terms In The Box" as "Sent" locations.  During the due diligence process, BriteVision, in response to BMG's requests for records relating to the contracts which Brite-Vision had with the locations in the Café Network, would materially alter such records  by substituting the designation "Agreement In Place" for "Sent."

33.     The "Terms In The Box" scheme was never disclosed in the BV Descriptive Memorandum or to BMG and was affirmatively concealed from BMG during due diligence because defendants were aware that disclosure of the "Terms In The Box Scheme" and the fact the "contracts" derived therefrom comprised over 50% of the locations allegedly in the Café Network would result in BMG or any other potential buyer either offering substantially less consideration to purchase the company or completely losing interest in the potential acquisition.

**The "Check Cashed" Scheme**

34.     The other fraudulent scheme devised by Morrison in his attempt to falsely inflate the number of signed contracts in the Café Network was the "Check Cashed" scheme, pursuant to which BriteVision sent the café or coffeehouse a box or boxes of sleeves accompanied by a $15 or $20 check.  If the café or coffeehouse cashed the check, then BriteVision would deem it bound to a 10-year exclusive contract with BriteVision.

35.     In its internal records, BriteVision referred to those locations which had been sent checks and then cashed the checks as "Check Cashed" or "Check" locations.  During the due diligence process, BriteVision, in response to BMG's requests for records relating to the con-tracts which BriteVision had with the locations in the Café Network, would materially alter such records  by substituting the designation "Agreement In Place" for "Check Cashed" or "Check."

36.     The "Check Cashed" scheme was never disclosed in the BV Descriptive Memor-andum or to BMG and was affirmatively concealed from BMG during due diligence.

**When Cafés And Coffeehouses Rebel Against The Terms In The Box Scheme,
Morrison And McKee Ignore Their Complaints And Continue To Employ The Scheme**

37.    Morrison and McKee were aware that there were severe problems with their

fraudulent schemes to increase the number of written contracts and locations in the Café Net-

work.  For example, on August 10, 2004, Morrison and McKee received an e-mail from Dave

Hume, a BriteVision Customer Service Representative and Campaign Manager, reporting that

cafés or coffeehouses who discovered the Terms In The Box, which was often referred to as the

"contract in the case," were outraged by the practice:

> Just want you guys to know we have lost two recruits for Bank Atlantic this mor-
> ning due to the contract in the case.  Both calls went something along the lines of
> "what is this scam you guys are running."  You need to address this problem now
> or we are going to lose tons of new cafes we recruit.  I estimate we have lost 25
> c-stores [due to] this stupid thing and I am getting frustrated about bringing it up
> and not getting any kind of action plan.  (emphasis supplied).

38.    When BriteVision's Operations Manager, Bill Mattle ("Mattle"), responded to

Dave Hume, Morrison, McKee and Brett that "[t] here is no reason we should lose any cafes due

to the contract, when we can send an addendum excluding said café from the agreement.  It is all

how you spin it," Hume replied that "we shouldn't have to spin it for these new cafes.  They are

already a little suspicious of the process, as free sleeves make no sense to them, and to get this

contract, we are off to a bad start."  (emphasis supplied).

39.    Despite numerous other complaints from customers about the Terms In The Box

and the failure of customers to cash the $15 or $20 checks, Morrison and McKee were forced to

step up both the Terms In The Box and Check Cashed schemes in order to fraudulently inflate

the number of cafés or coffeehouses which BriteVision could claim were under contract.  Thus,

on August 13, 2004, only three days after Dave Hume reported the substantial problems with the

scheme, McKee sent an e-mail to BriteVision's Vice President of Operations, Luke Zaientz

("Zaientz"), about both the Terms In The Box and Check Cashed schemes, emphasizing the need

to document the number of locations bound by these schemes:

> it is vital that lauren spend her remaining time at BVM printing UPS delivery
> confirmation and collecting delivery logs for cafes who have received a contract
> in a case, especially the mass of customers that have been uploaded in netsuite in
> the last month.  attached is a list of customers who we need delivery confirmation
> for.  can you please focus her efforts on obtaining confirmation on these custo-
> mers before her last day.  please confirm.
>
> as for the checks, we would like to hold off and get some data on the 1200 checks
> that have already gone out before we send any more.  hopefully we'll have some
> data next week and can proceed with the mailings the following week.  (emphasis
> supplied).

40.    On August 18, 2004, McKee provided Morrison with a "Contract Status Update"

which revealed that of the 5,665 cafés or coffeehouses represented BV Descriptive Memorand-

um as comprising the Café Network, only 1,916 of such cafés and coffeehouses were actually

bound by signed contracts:

> Here is a summary of how our contract coverage stands as of today:
>
> | | |
> |---|---|
> | Cafes w/signed contract: | 1916 |
> | Cafes sent a contract [i.e., Terms In The Box scheme]: | 1493 |
> | Cafes with no contract: | 1838 |
> | Promotional checks cashed [i.e., Check Cashed scheme]: | 5 |
>
> Lauren has printed off delivery confirmation on a number of UPS shipments since
> last week, but we are still only 65% covered at this point.
>
> Luke, is Lauren going to begin pulling backup for shipments made via local
> delivery?  When is her last day, we need delivery confirmation on 1300 more
> customers in order to be 90% covered.  (emphasis supplied).

41.    In its attempt to fraudulently inflate the number of contracts and to obtain the

additional 1,300 customers it desperately needed, BriteVision continued to employ the Terms In

The Box scheme and continued to receive complaints from cafés and coffeehouses about them.

Thus, on August 23, 2004, BriteVision's Dave Hume sent Morrison an e-mail entitled "sick of

this," which referred to a complaint he had just received from Life Café in New York and stated:

I am so tired of being called names and bitched out due [to] the agreements in this case. I was just called names and threatened. STOP DOING THIS, WE ARE LOSING CAFES WE COULD EASILY PICK UP CONTRACTS FROM AT A LATER DATE. STOP!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!! (emphasis in original).

42.    On August 24, 2004, McKee sent Morrison an e-mail titled "contracts update," attached to which was a spreadsheet entitled "Summary of Independent Cafes in the BriteVision Media Café Network." This spreadsheet demonstrated BriteVision's reliance upon the fraudulent "Terms In The Box" and "Check Cashed" schemes in order to falsely increase the number of locations in the Café Network. With respect to contractual status, the spreadsheet had four columns: "Check," "No Contract," "Sent," and "Signed," and revealed that there were 1,556 locations with "No Contract," while 1,614 locations were designated "Sent" or "Check," meaning that for such 1,614 locations, BriteVision was claiming the existence of a contract based solely upon the "Terms In The Box" and "Check Cashed" schemes. Morrison and McKee never disclosed to and affirmatively concealed this material spreadsheet or its categories from BMG, clearly aware that such disclosure would have revealed the fictitious nature of the Café Network and would severely damage their ability to sell BriteVision and would significantly decrease any purchase price defendants might be able to obtain for the company.

43.    When others at BriteVision, including Mattle and newly-hired Vice President and Director of Operations Chris Lanman ("Lanman"), complained about the Terms In The Box scheme and the onerous terms of the hidden contracts (e.g., "[b]y the time a cafe owner reads through this I think they are already pissed off and are not interested in discussing the terms"), Morrison in an August 25, 2004 e-mail refused to abandon the scheme because: "We need the contracts. ... This is a foundation in our contract strategy that cannot be altered without a comparable solution." (emphasis supplied). That the Terms In The Box scheme was the alleged

"foundation" in BriteVision's contract strategy was a material fact that was never disclosed to BMG and, in fact, was affirmatively concealed from BMG by defendants.

44.     On the very next day, August 26, 2004, Dave Hume sent an e-mail to Morrison and McKee reporting verbatim the remarks made to him about the Terms In The Box scheme over the telephone by the owner of Aroma Coffee Roaster from Larchmont, New York:

> "if you call me again, if I ever get another case again and if this isn't f***ing picked up in 1 day by you motherf***ers I'll have you in court so fast your f***ing head will spend, you motherf***er." Click.
>
> Thanks, fellas. I needed that.

45.     Despite the above, Morrison continued to utilize the Terms In The Box scheme and pushed McKee and others to gather the alleged "evidence" of such contracts. On August 28, 2004, Morrison sent McKee an e-mail in which he directed McKee to "compile and bring me all of the delivery logs that we have in the office for the last 3 months ASAP Monday morning. I need to have someone pick up where Lauren left off (printing UPS confirmations and pulling delivery logs for a 'contract in a case' [Terms In The Box] customers)."

46.     On the next day, August 29, 2004, Morrison sent Lanman an e-mail in which he acknowledged that it was necessary to perpetuate the fraudulent Terms In The Box and Check Cashed schemes because of the due diligence that parties interested in acquiring BriteVision would no doubt engage in, i.e., "[w]e need to obtain approximately 1,500 more written contracts over the next 3-4 weeks. ... This project is urgent (3-4 week timeframe) due to M&A activity." (emphasis supplied).

47.     On August 30, 2004, McKee sent Morrison a spreadsheet allegedly containing a "list of customers with signed contracts." When Morrison, who was surprised at the large number thereon, sent McKee an e-mail asking "[d]oesn't this spreadsheet suggest we have over 3200 contracts?" McKee responded the next day by admitting that the number was inflated be-

cause "there are MANY customers with multiple contracts." McKee noted that "[t]he net list is much shorter, especially after you eliminate any inactives (2077 is the net number)." (emphasis supplied).

48.     It was also on August 30, 2004 that McKee sent Morrison an e-mail explaining the progress (or lack thereof) being made in connection with BriteVision's employment of the Terms In The Box and Check Cashed schemes and the efforts which had been made by Zaientz, BriteVision's Vice President of Operations, prior to his leaving the company, to falsely inflate and document the number of contracts for cafés or coffeehouses in the Café Network:

> Below is a summary of the various avenues Luke was employing to obtain contracts for the cafe network, along with ARs [action required] to complete his project.  There is a significant bridge to gap in order to be well prepared for the due diligence. ...

> 1.      Mailed Checks:  Luke planned to send 1598 checks (1209 Sent ... 115 cashed) ...

> 3.      Street Team to get signed contracts:  Luke planned to have 1639 cafes approached by a street person (339 contracts have been received)

> 4.      Confirmation of contracts in a case deliveries

> -      AR:  Bill to talk to Bob [Robert Lawrence Morrison, the father of defendant Morrison] about obtaining delivery confirmation on these accounts.  If not Bob, then a temp will be brought in to complete this task.

> -      AR:  Tony to alphabetize and organize all remaining delivery logs and UPS confirmations.

49.     Just as BriteVision customers were rejecting the Terms In The Box scheme when they discovered it, the Check Cashed scheme was also meeting opposition.  For example, on September 8, 2004, BriteVision received an e-mail from a customer which stated:

> I received Britevision Media's check in the amount of $20.00 to secure exclusive advertising rights to my location. This is to inform you that I do not accept this check, nor does Britevision Media or any of it's subsidiaries have any exclusive marketing rights now or in the future to my location. You are to cease sending any further coffee sleeves or other materials to Oakwells.

50.     At the same time, BriteVision began to tell customers who complained about the Terms In The Box scheme that such customers were not bound to the alleged contract with BriteVision.  For example, on September 10, 2004, Dave Hume sent an e-mail to a café which provided:

> Debra, this email is to inform you that Steve's Kona Joe Coffee Cart Inc., 2044 Easy Ave, Long Beach California  90810 is not bound to terms and conditions contained in the agreement in the cases of Britevision Coffee sleeves or in the agreement you sent back to our company.  Enjoy the sleeves at your discretion. (emphasis supplied).

Despite the above e-mail, BriteVision continued to list Steve's Kona Joe Coffee Cart in its records as a location which was contractually bound to BriteVision.

51.     The following day, September 11, 2004, McKee sent an e-mail to BriteVision's sales force asking that they send him a "list of customers who rejected terms in the case":

> Dave, thanks for sending all of these to me.  It is vital that I know about any customer who has rejected the contract that was included in their case of product.
>
> Can all of you please send me everything (fax, emails, etc) that you have sent to a customer allowing them to use product without agreeing to the terms in the case. (emphasis supplied).

52.     That same day, Morrison, seeing that this Terms In The Box scheme was failing, wrote McKee:  "That sucks, that was the agreement I was so excited about!" (emphasis supplied).  This did not, however, stop Morrison from continuing the fraudulent scheme because its entire purpose was to falsely inflate the number of locations in the Café Network, which was BriteVision's major selling point.  Morrison was well aware that the number of locations in the Café Network would play a material role in determining how much money prospective buyers, including BMG, were willing to offer to buy the company.

53.     Indeed, Morrison and McKee amplified the fraudulent effects of the Terms In The Box scheme by treating those locations which had rejected the contracts and which had been told

by BriteVision that they were not contractually bound to BriteVision, as nevertheless having "Agreements In Place" and reporting them as such on documents provided to BMG and other potential purchasers of BriteVision in due diligence.

54.     On September 20 and 21, 2004, Hume informed Morrison of additional customers who wanted to return the coffee sleeves because of the Terms In The Box scheme. With respect to one such customer, Hume wrote:

> Called screaming mad about the contract in the case. Said I had "huge b*lls" to do this. I had to beg her (yes, her) to stay and she insists I send them a letter letting them out of any obligations. Getting off on a bad foot with quality new cafes like this is bad business. I am now in a defensive posture and have to earn trust back. (emphasis supplied).

55.     At no time during his discussions with Friedman and other representatives of BMG in July, August or September 2004 (or at any time thereafter) did Morrison, McKee or any one else at BriteVision disclose the existence of: (a) the Terms In The Box scheme; (b) the Check Cashed scheme; and (c) the opposition to such schemes by the cafés and coffeehouses and the outrage being expressed by them. Rather, Morrison and McKee affirmatively concealed and failed to disclose these fraudulent schemes and further concealed from Friedman and BMG the truth that the number of locations in BriteVision's Café Network and the nature of the "contracts" and relationships with such locations as represented in the BV Descriptive Memorandum was grossly and recklessly exaggerated and outright false.

**The October 1, 2004 Letter Of Intent**

56.     On October 1, 2004, a Letter of Intent ("LOI") was entered into by: (a) Morrison (individually and on behalf of the owners of the membership interests in BriteVision, i.e., Morrison, Hume, Dore, Mills and BLM [the "Members"]) and Brett; and (b) Friedman (President and CEO of Pacific Merchant Capital Corporation ["Pacific"]) and William P. Phoenix ("Phoenix") (Managing Director of Trimaran Capital Partners ["Trimaran"]).

19

57.     Pursuant to the LOI, a company to be formed by Pacific and Trimaran [BMG] would acquire from the Members 100% of the stock of BriteVision for approximately $33 million, comprised of a substantial cash payment and stock in BMG.

58.     Paragraph 5 of the LOI dealt with due diligence and provided, in relevant part:

> From the date of this Letter of Intent until the termination of this Letter of Intent, [BriteVision] shall, upon reasonable notice, make available to [BMG] and its representatives (including its attorneys and accountants) <u>all documents, instruments, books and records in its possession, financial and otherwise ... relating in all respects to the assets of [BriteVision]</u>, permit physical inspection of the facilities of [BriteVision] by all such parties, and reasonably cooperate with [BMG] to enable [BMG] to complete its business, accounting and legal review of the business and assets of [BriteVision] ... Until such time as a Purchase and Transfer Agreement may be executed which shall supersede this Letter of Intent, this proposal is contingent upon and subject to (i) proper confirmation and verification by [BMG] and its accountants of the accuracy and completeness of any financial information provided to [BMG] by [BriteVision] and the books, records, contracts and other information pertaining to the business and operations of [BriteVision], and (ii) inspection of the assets of [BriteVision], all to the satisfaction of [BMG] in its sole discretion.  (emphasis supplied).

Pursuant to ¶4 of the LOI, BMG was to use commercially reasonable efforts to conclude its due diligence by November 3, 2004.

**<u>Defendants Seek To Defraud BMG From The First Day Of The Due Diligence</u>**

59.     The due diligence process, which began immediately upon the execution of the LOI, was marked by close to all communication and information flow on the BriteVision side going solely through Morrison, McKee and Brett, <u>i.e.</u>, the three Senior Executive Officers of BriteVision.

60.     On October 2, 2004, one day after executing the LOI, Morrison and McKee, in anticipation of their first due diligence meeting with BMG on October 4, 2004 and in direct violation of BriteVision's due diligence obligations under ¶5 of the LOI , began conspiring as to how to conceal the true state of affairs at BriteVision from BMG by providing false and materially misleading financial and other information to BMG.

61.     Internal e-mails between Morrison and McKee reveal that on October 2, 2004, Morrison, after reviewing some financial data prepared by McKee to provide to BMG, told McKee that his assumptions on costs were "high" and that "[w]e need to create a better picture since we're going to close before the year is done anyways.  This is no time to be conservative." Morrison further instructed McKee that "[t]he picture must allude to the fact that we have a chance of hitting our #s or we look like total fools out of the gate, and the tone will be horrible. They are going to take tens of millions away. ..."  (emphasis supplied).

62.     In his October 2, 2004 e-mail, Morrison directed McKee to alter the financials in order to conceal the truth and to put information and figures in them which both Morrison and McKee knew to be false but which would misleadingly present a far different and more favorable financial picture for BriteVision than actually existed.

63.     For example, regarding the expected revenue for November 2004, Morrison, although he admitted to McKee that it "isn't going to exceed $500-$650k," nevertheless told McKee to "go with $700k."  (emphasis supplied).  In addition, although McKee believed that the Cost of Goods Sold ("COGS") was 30% of revenue and Morrison claimed it was 27.5%, Morrison instructed McKee to "go with 24%" in due diligence.  (emphasis supplied).

64.     Similarly,  although Morrison acknowledged that McKee's figure of 12% of revenue for distribution and warehousing was correct, he told McKee to "go with 6%," a number which had no basis in reality and was half of the true number (12%) which he considered "ridiculously expensive."

65.     McKee was clearly aware that the changes being dictated by Morrison would make the financial documents to be provided to BMG materially misleading and expressed his concern to Morrison when he wrote:  "I'll update the P&L for these changes before you come in today, but I'm very concerned with not being conservative."  (emphasis supplied).  Morrison's

21

response demonstrated that the truth did not interest him: "This is all about 'tone' in the begin-ning week – results won't be finalized until after we close." McKee, however, was still concern-ed, writing back: "I understand the tone issue, I'm just concerned about what happens on the backend if we don't kick ass the rest of the year (i.e. we post EBITDA closer to $2.5M than $3.5M)." (emphasis supplied).

66.    It was also on October 2, 2004 that BMG's Friedman provided Morrison and McKee with a document entitled "Preliminary Due Diligence Items and Planning (Initial Focus on 2003, 2004 and Projected 2005)." In that list, BMG requested copies of specific categories of documents and information, including, inter alia: (a) "all sleeve customer contracts;" (b) "month-ly financial statements and reports from January 1, 2003 through the present;" (c) "business plans, internal management systems or key management tools;" and (d) a "list of any other material items or issues that we should be reviewing or considering." (emphasis added).

67.    Despite BMG's particular requests, Morrison, McKee and Brett, throughout the entire due diligence process and even post-closing, withheld key management tools and conceal-ed from BMG material items and critical issues that they were aware of and were reviewing, knowing that such tools and information would have revealed the true state of affairs at Brite-Vision, which was materially different than represented in the BV Descriptive Memorandum and in the information which defendants would be providing to BMG in due diligence.

**Defendants' Fraudulently Alter The Spreadsheets Relating To The Café Network**

68.    From the moment that due diligence began, defendants acted in bad faith and went to great lengths to mislead and conceal from BMG the truth about the size, strength and nature of the alleged Café Network. Defendants concealed from BMG the fact that the number of cafés and coffeehouses in BriteVision's Café Network as represented in the BV Descriptive Memorandum was grossly and recklessly exaggerated and outright false and affirmatively

concealed and failed to disclosed the existence of: (a) the Terms In The Box scheme; (b) the

Check Cashed scheme; and (c) the opposition to such schemes by the cafés and coffeehouses and

the outrage being expressed by them. In addition, defendants misrepresented the number of

cases of coffee sleeves being consumed by the locations each month, a critical figure in assessing

the strength of the Café Network.

69.     On October 4, 2004, Friedman and Neal Schore ("Schore"), BMG's President,

met with Morrison and McKee to follow up on BMG's October 2, 2004 written request for docu-

ments and information. At that first due diligence meeting, Friedman asked for various infor-

mation relating to numerous items, some of which information McKee agreed to e-mail to him

later that day.

70.     Later than night, McKee, apparently without having cleared it with Morrison, sent

e-mails to Friedman and attempted to attach various spreadsheets thereto containing the infor-

mation requested by BMG, two of which spreadsheets contained information relating to the Café

Network. In the first e-mail, re "Item #1:  Signed Contract File," McKee wrote Friedman:

> This series of emails contains the files you requested this evening. Some of these
> files are rather large so I'm going to send them in individual emails. Attached is
> the summary of all of the signed contacts we have on file listed by location.
> (emphasis supplied).

71.     In another e-mail that night, re "Item #5: List of independent cafes w/lead form

volume and s&h info," McKee wrote Friedman:

> Attached is the summary file of our independent and chain networks. The first
> tab, "Lead Form Volume & S&H", contains a list of our independent cafes indi-
> cating the lead form volume and payment status of each. (emphasis supplied).

This spreadsheet disclosed the "Lead Form Volume", i.e., the indicated number of cases of

sleeves received per location per month.

72.     Morrison was copied on both of these October 4, 2001 e-mails. Upon receiving

his copies and learning that McKee had apparently provided BMG with the above spreadsheets,

Morrison panicked and became livid because he knew that the information contained in the spreadsheets was extremely damaging to BriteVision and would perhaps irreparably harm his efforts to sell the company. Morrison immediately sent McKee an e-mail that night which stated: "Let's talk about all these lists you sent out first thing in the a.m. Very concerned about the position we are now in." (emphasis supplied).

73.     Morrison had good reason to be extremely concerned about Friedman's receiving the attachments to these two e-mails because such attachments would have revealed, inter alia: (a) the existence of the Terms In The Box and Check Cashed schemes; (b) a large number of locations with either no contracts, short-term contracts or expired contracts; (c) the fact that less than half of the alleged contracts had been actually signed by the location; and (d) that 35% of such locations had a zero in the column indicating the number of cases they received monthly.

74.     Morrison was obviously aware that the disclosure of the above information as set forth in the spreadsheets to BMG could cause BMG to either re-think the amount of consideration it was offering for BriteVision or, even worse, walk away from the transaction completely.

75.     Fortunately for Morrison and McKee, Friedman did not receive either of the two critical e-mails or their attachments because his ISP (internet service provider) did not have the capability to handle e-mails with very large attached files (such as the two spreadsheets which McKee attempted to send). Friedman did, however, receive three other items of information (item #s 2, 3 and 4) which had been requested.

76.     On the next day, October 5, 2004, Friedman, who had been eagerly awaiting the crucial information relating to the contracts in the Café Network, telephoned both McKee and Morrison to ask where the two contract files which were supposed to have been sent to him were. Upon learning that Friedman had not received the data, Morrison was overjoyed and sent McKee and Brett an e-mail entitled "good news," which was that Friedman had not received the two

24

contract files and instead "only got #2, #3, #4 due diligence – the harmless data." (emphasis supplied).

77.     Friedman's failure to receive the two contract files was "good news" because Morrison and McKee could now manipulate the contract data to create a materially false picture relating to the contracts which would conceal, inter alia, the inability of the company to ship sleeves into the Café Network and the fact that the majority of BriteVision's contracts were either unsigned by and/or unknown to the cafés or coffeehouses, i.e., they were not contracts at all. As Morrison wrote to McKee:

> Assuming they don't eventually come through, the larger files got bounced back and we can re-send in the format that we want w/out the inactives, etc.
>
> Bill, let's discuss how to present this data along with the rest of his list after we figure out inventory. (emphasis supplied).

78.     While celebrating the "good news" that Friedman had not received the e-mails containing the two contract spreadsheets, Morrison received an e-mail from Friedman informing him that Friedman's "E-mail should be able to handle up to 20 MB now." Morrison immediately forwarded this e-mail to McKee and Brett, noting that Friedman "changed his e-mail to be able to handle large files now. I don't know if this means he didn't get the first file or if he can some-how retrieve that in cyberspace." (emphasis supplied). Brett spoke for Morrison and McKee when he wrote back: "yes, could be bad news if he upped it, as the original file could still be trying to deliver and could eventually make it to his inbox." (emphasis supplied). Morrison, McKee and Brett all knew that it would be "bad news" if BMG found out the truth about the "contracts" or lack thereof which supposedly comprised the Café Network.

79.     On October 5, 2004, Friedman sent an e-mail to Morrison and McKee to follow-up on the previous day's first due diligence meeting. In his e-mail, Friedman set forth some of the key items that were to be made available by BriteVision to BMG, including:

a.  "<u>Signed contract file</u> (we'll follow up on the actual contracts we might want to pull)."

b.  "<u>Chain summary with sleeve usage estimates.</u>"

c.  "<u>Customer summary with sleeve requirement estimates</u> and, if possible, an indication of those customers paying shipping and handling (Bill: <u>if you end up modifying the direct output of the system by adding or changing certain sleeve requirement estimates, could you please note somehow those customers you modified versus the actual output</u>)."

d.  "<u>Sample ... contract versions</u>: to confirm, I walked out with numbers 1-11, 19-23 and 25; if you might be able to double check, the only page that came through with a double sided copy was agreement page marked 22 (could you please fax or fedex to me any back pages)."

e.  "To ensure that we get our arms fully around the entire "network," (and prior to digging in further on available ad inventory), could you check over [a] and [b] above and provide the information on any coffee houses that are not included in [a] and [b] above to get an overall general tie out to the total locations provided in the book.  (emphasis supplied).

80.  During that first due diligence meeting on October 4, 2004 at BriteVision's headquarters, Friedman was in McKee's office and was shown by McKee binders containing numbered versions of the forms of contracts which BriteVision was allegedly utilizing with its customers. The Terms In The Box "contract," although by far the form of contract most frequently used by BriteVision, was <u>not</u> among the versions contained in the binder or made available or disclosed to Friedman.  Similarly, the Checks Cashed "contract" was nowhere to be found in the binder.

81.  Defendants purposely concealed the existence of the Terms In The Box "contracts" (as well as the Check Cashed "contracts")  because they knew that if any potential purchaser of BriteVision, including BMG, learned that BriteVision was relying upon these documents as evidence of the size and strength of the Café Network, then such purchaser would either rapidly lose interest in any acquisition or, at best, offer substantially less to purchase the company than the owners of BriteVision sought to obtain.

82.     In order to conceal from BMG the true state of affairs relating to BriteVision's alleged Café Network and to materially mislead BMG into believing that BriteVision had more contracts in place and more capacity to receive sleeves, McKee and Morrison altered the spread-sheets by changing the contract types to indicate "Agreement in Place" as opposed to "Sent" [Terms In The Box scheme] or "Check Cashed" [Check Cashed scheme].  The revised spread sheets fraudulently misrepresented that there were over 4,000 locations with "agreement in place."

83.     In addition, defendants materially altered the spreadsheets to make it appear that the "indicated monthly sleeve requirements" of the cafés and coffeehouses were significantly higher than BriteVision knew to be the truth, in some situation going so far as to falsely indicate that locations which had not been shipped any sleeves for several months were actually receiving sleeves.

84.     Defendants also altered the spreadsheets by extending the purported length of BriteVision's contracts with the café or coffeehouse.  Thus, although the form contract utilized by BriteVision for its Terms In The Box scheme stated that if the location was already bound by a contract with BriteVision, then the Terms In The Box did not apply, Morrison and McKee often ignored that language when preparing spreadsheets purporting to show the locations under contract and, with respect to many locations that had contracts in place that were to expire earlier, misleadingly changed and falsified the expiration date to 2014, thus making it appear that BriteVision had a substantial number of contracts in place for a lengthy period of time when in fact those contracts were to expire at a much earlier time.

85.     When altering the contracts spreadsheets, Morrison and McKee similarly ignored the fact that BriteVision, in response to the substantial opposition and outrage it had encountered from locations to the Terms In The Box and Check Cashed schemes, had sent e-mails to such

locations informing them that they were not contractually bound to BriteVision. On the altered contract spreadsheets, Morrison and McKee continued to falsely list these locations as having an "Agreement In Place" with BriteVision.

86.     In order to further conceal from BMG the true state of affairs relating to Brite-Vision's alleged Café Network, Morrison and McKee decided, on the new spreadsheets to be sent to Friedman, to manipulate other data set forth therein including, inter alia, the data relating to estimated usage of coffee sleeves or "lead form volume" in the network. Thus, in those instances where the café had a zero under the column that listed the amount of cases shipped to each café on a monthly basis, Morrison instructed McKee on October 5, 2004 to alter the spread-sheet to use "recent shipments" or, if the cafés were not receiving any shipments, to lie and state that each of these cafés was receiving two cases per month.

87.     On the following day, October 6, 2005, Morrison, in order to cover up their tracks and conceal the fact that they had manipulated the data, further instructed McKee to put these fictitious numbers relating to lead form volume into NetSuite (BriteVision's financial manage-ment system) so that "when they do a pull text time," i.e., attempt to review this data at a later date, it would falsely appear that these numbers had always been in the system.

88.     After discussing all of the above fraudulent changes to be made to the contracts spreadsheets, McKee altered the Master Summary Cafés and Coffee Houses spreadsheet and sent it to Morrison and Brett on October 8, 2004, noting that the numbers relating to the amount of sleeves which BriteVision had the capacity to ship were still "not high enough" and would have to be further inflated:

> Attached is a file containing the summary of our network (independents & chains). Lets talk about this as soon as you have some time today. The capacity for advertisements is not high enough. We will need to adjust the lead form volume [the indicated number of cases per month for a location] or include some of the distributors in the analysis to bring the number up. (emphasis supplied).

McKee confirmed to Morrison that once they "decide on the capacity numbers" he "will upload them into netsuite." At this point, McKee's summary, which included, inter alia, locations that were not accepting sleeves but nevertheless were listed as receiving two cases monthly, showed approximately 10.9 million sleeves per month as the capacity for the independent locations.

89.     After suggesting numerous other changes to be made to the spreadsheet, McKee wrote that they need "to work on cleaning up the master database before Bruce [Friedman] or anyone comes out here." He further noted the intention to conceal material information from BMG: "Note: I will not send this entire to file to Bruce, only the two sheets containing the independent and chain summaries will be sent." (emphasis supplied).

90.     Later on October 8, 2004, McKee sent Friedman and Schore the altered and doctored independent network summary which they claimed contained "all pertinent info related to contracts," but which in fact deleted any references to the Terms In The Box and Check Cashed schemes and now showed many of the locations with an inflated estimate of three (vs. two) cases per month and represented the increased number of 14.3 million sleeves per month as a reasonable "average" of the shipments to the locations. In reality, and as Morrison and McKee well knew, there was no support for these inflated figures, which they had in fact created earlier in the day because the true "capacity for the advertisements was not high enough."

91.     At no time prior to the closing did defendants ever disclose to BMG the true size, strength and nature of the Café Network. Instead, defendants affirmatively concealed from BMG, inter alia: (a) the existence of the Terms In The Box and Check Cashed schemes; (b) the fact that a substantial number of the locations in the Café Network had either no contract, short-term contracts or expired contracts; (c) the fact that less than half of the alleged contracts that comprised the Café Network had been actually signed by the location; (d) the fact that only 65% of the locations were "active," with 35% of such locations having a zero in a column indicating

29

the number of cases they received monthly; or (e) the true number of cases, if any, being received by the locations each month.

**Defendants Conceal From BMG The Existence
Of BriteVision's Substantial Operational Problems**

92.     Although defendants represented to BMG that BriteVision was operating smoothly and was delivering its product on a timely basis, they were well aware, and affirmatively concealed from BMG, the material facts, inter alia, that the company had severe operational difficulties and did not even have the ability to deliver the current sleeves that it had sold.

93.     On October 11, 2004, BMG, as a follow up to its initial due diligence requests, asked BriteVision to "ensure all listings are actually being shipped sleeves at this point," i.e., that sleeves were being shipped to cafés and coffeehouses pursuant to the contracts entered into between BriteVision and its advertisers.  Although BriteVision clearly knew that all listings were not being shipped sleeves and that there were other material problems relating to the shipment of sleeves, none of these material facts were disclosed to BMG by defendants and were in fact affirmatively concealed from BMG by defendants.

94.     During the critical first month of due diligence in October 2004 (as well as thereafter), Morrison, McKee and Brett, all of whom were painfully aware of the poor state of BriteVision's business, acted in bad faith and went to great lengths to materially mislead BMG regarding the true state of affairs at the company.

95.     An internal e-mail authored by Morrison and distributed to McKee, Brett and others at BriteVision demonstrates that, as of October 21, 2004, Morrison and his senior executives were aware, but failed to disclose to BMG, that:

    a.     BriteVision was facing "horrifying" issues which "will require dramatic action to fix;"